Filed 2/3/14  P. v. Navarette CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B247008 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096065) |
| v. | |
| JONATHAN NAVARETTE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

———————————

Defendant and appellant, Jonathan Navarette, appeals from the judgment entered following a jury trial[1] which resulted in his conviction of second degree robbery (Pen. Code, § 211),[2] during which a principal was armed with a firearm (§ 12022, subd. (a)(1)), attempted second degree robbery (§§ 664, 211), during which he personally used a firearm (§ 12022.53, subd. (b)) and petty theft (§ 484, subd. (a)). The trial court sentenced Navarette to 12 years in state prison. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

    a. *Count 1 – second degree robbery.*

In late-September 2011, Craig Caddow wished to purchase a car. He looked on Craig's List, "a place to list for sale and for buying different things on the internet," and found an advertisement for a silver Honda he was interested in purchasing. Caddow called the telephone number listed in the advertisement and spoke to a man who identified himself as Albert. Albert indicated he was willing to sell the car for $5,000 and he and Caddow made a plan to meet at the Banning Department of Motor Vehicles (DMV).

The following day, Caddow's mother dropped him off at the DMV. After a few minutes, Caddow saw the Honda pull into the parking lot. Caddow walked over, spoke with Albert for a few moments, drove the car, then offered to pay $4,700 for it as the paint "was quite a bit rougher than [Albert] had described [it]." Albert, who Caddow later identified as Navarette's codefendant, Adalberto Gildo, accepted the offer and Caddow gave to him $4,700. The two men then went into the DMV to finish the transaction. At that time, Caddow noticed that the name on the pink slip to the car was not Gildo's, but that of a woman named Beatris. After Gildo and Caddow walked out of

---

[1]     Navarette was tried with a codefendant, Adalberto Gildo. However a separate jury was selected for and decided each defendant's case. Although both juries heard evidence which applied to both defendants, only the jury assigned to Navarette heard evidence which pertained only to him.

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

2

the DMV, Gildo told Caddow that he would simply forge Beatris's signature. However when Caddow indicated he was not comfortable with that approach, Gildo called Beatris, then told Caddow that she was at work at a Sears store and they would have to drive half-way, somewhere between Banning and La Puente, to meet with her to get her signature.

When Gildo had arrived at the DMV parking lot, Caddow had noticed that he had been followed by a man in a red Jeep. Caddow had also noticed that the Jeep had all hand controls as if it had been modified for a paraplegic and, before he and Gildo had gone into the DMV, Caddow had spoken with the man in the Jeep because Gildo had failed to bring any identification with him. The man in the Jeep had showed to Caddow his identification which indicated his address was in Los Angeles. Although at this point Caddow was "a little nervous" because Gildo had no identification and the name on the pink slip was not his, Caddow nevertheless offered to drive the Honda half-way to La Puente to obtain Beatris's signature. Caddow indicated that, after he had gotten Beatris's signature on the Honda's pink slip, he would go to the DMV and complete the transaction.

Caddow began driving toward La Puente with Gildo in the passenger seat and the man in the Jeep following behind. During the trip, Gildo received several telephone calls, after one of which he informed Caddow that Beatris could not get off of work and they would have to drive the entire distance to the La Puente Mall to meet with her. When they arrived at the mall, Gildo told Caddow where to park. At that time, Caddow had the keys to the car and, when he asked Gildo if there was another set, Gildo told him there was not. Before Caddow and Gildo headed toward the mall, they walked over to the Jeep, which had parked approximately 15 feet from the Honda. Gildo told the driver that they were going into the mall and "just to wait."

As Gildo and Caddow walked toward the Sears store, Caddow noticed a man, who was later identified as Navarette, walking in the other direction. Caddow then heard the alarm go off on the Honda and, when he looked, Caddow saw the "Honda lights [go] off and [he] noticed it unlock." It appeared to Caddow that Navarette was walking toward the Honda so he too began to walk back toward the Honda. Not only had Caddow paid

3

Gildo $4,700 for the car, he had left in the car his phone, iPad, keys and briefcase.  As Caddow headed for the Honda, Gildo walked toward the Jeep.  Navarette then appeared to be backing away from the car so Caddow turned and ran after Gildo.  However, Caddow then "heard the car door over at the Honda open again.  [He] turned around and went to grab [the Honda's open door] and that's when it all went south."  Navarette attempted to drive the Honda away, but stalled the car.  Caddow then struggled with Navarette as he tried to close the partially open car door.  At that point, Caddow heard the "chambering of a gun" and heard Gildo yell out, " 'Don't fuck around.  You're going to get shot.' "  When Caddow looked over his shoulder, he saw Gildo sitting in the back seat of the red Jeep "holding a [black semiautomatic] gun" which he had pointed at Caddow.  Caddow, who believed Gildo would shoot him, ran and hid behind a car in the lot.  He waited until he saw the Jeep leave the parking lot, then again approached the Honda.  By this time, Navarette had shut and locked the door, so Caddow "punched the window three times [then] backed up and jump[] kicked at the window."  Navarette was nevertheless able to pull away, drive out of the parking lot, turn onto the main street and drive toward the 60 Freeway.

After the Jeep and the Honda left the parking lot, Caddow called 911.  When Caddow later spoke with police, he gave them a description of the Honda and what he believed to be the license plate number and told them that one of the individuals involved in the taking of his money and the car had pointed a gun at him.  Caddow was then shown a photographic lineup.  After reading the admonition, Caddow identified Gildo as the man who had aimed the gun at him.  On a separate date, after again reading an admonition, Caddow identified Navarette as the individual who had driven the Honda out of the parking lot.[3]

---

[3]     Caddow indicated he was more than 70 percent certain the photograph he had identified was that of Navarette.

b. *Count 2 – attempted second degree robbery.*

In October 2011, Naser Tamimi placed an advertisement on Craig's List indicating he wished to purchase a car for $1,000. Tamimi had put his telephone number in the advertisement and in mid-October he received a call regarding a car from a man who identified himself as "Sergio."[4] Sergio called and "texted" Tamimi several times. During their conversations, Sergio indicated he was a police officer and, when the two men first met in the parking lot of a Ross store in Bell Gardens on October 20, 2011, Sergio showed to Tamimi a badge. Tamimi then drove the car Sergio wished to sell, a 2005 five-speed silver colored Honda Accord. Tamimi liked the car and when the two men discussed the price, Sergio indicated he wanted $2,000 for it. Tamimi offered him $1,700 but after some discussion Tamimi agreed to pay the $2,000. Tamimi then noted that the car was registered, not to Sergio, but to a woman named Beatris Cortez.

Tamimi met Sergio later the same day in a parking lot of a Carl's Jr. restaurant across the street from the Commerce Casino. Sergio was with two other men. Navarette was riding with Sergio in the front seat of the Honda and the second man was in a mini-van. When Tamimi, who had driven his own car to the parking lot, indicated he was concerned about getting the Honda to his home, Sergio told Tamimi that his cousin, Navarette, would ride with Tamimi in his car and Sergio would drive the Honda. Sergio then indicated that they first needed to go to his house, which was approximately three miles away, to take out of the Honda a car seat and various papers. As Sergio drove off in the Honda, Tamimi and Navarette followed him in Tamimi's car and the individual in the mini-van followed Tamimi.

Sergio led the group of vehicles to a residence approximately three houses from the intersection of Ditman Street and Olympic Boulevard. As there was no place to park on the street, Tamimi parked his car in the lot in front of a liquor store on the corner. While Tamimi waited in the store, Navarette went into the nearby residence and changed his clothes. A short time later, Tamimi received a telephone call, which prompted him to

---

[4] It was later determined "Sergio" was actually Navarette's codefendant, Gildo.

go from the store out to his car in the parking lot. There, Navarette approached him, then "jumped" him and held him. As Navarette pulled a gun from his jacket pocket and pointed it at Tamimi's chest area, he told Tamimi to " 'give [him his] money.' " Tamimi, who was frightened and believed he might be killed, nevertheless pushed the gun away and ran down the street, across Olympic Boulevard and into a store. From inside the store, Tamimi used his cellular telephone to call 911.

Later, after having indicated he understood an admonition read to him by a police officer, Tamimi viewed a lineup. From the individuals shown, Tamimi identified both "Sergio" and Navarette.

In October 2011, Hector Torres lived in a home in La Puente with his children, his wife, Maria Torres, his wife's sister, Beatris Cortez, and Cortez's husband, Adalberto Gildo. Cortez and Gildo had moved into Torres's home in late-September and stayed there for approximately one month. Gildo had told Torres he was a policeman.

One day in late-September or early-October, Torres and Gildo went target shooting together. Torres, who kept his gun, a nine-millimeter black Beretta, in a locked container in his bedroom, took it out of the container to take it shooting. Gildo brought his own gun, which was "white and chromed."

Maria Torres believed Gildo moved into her house on September 20 or 21, 2011. One day in October, police officers came to Torres's home and, although she was not there when they first arrived, Torres went to her house a short time later. After calling her husband, Torres was able to show the officers where his gun was and to tell them "some of the details about it."

With regard to her sister, Beatris Cortez, Torres indicated she generally left the house to go to work at approximately 6:30 a.m. and, after picking up the children at school, arrived home between 3:30 and 4:00 p.m. Gildo, who was usually the last one to leave the house in the morning, had told Torres he was a sheriff.

c. *Count 3 – petty theft.*

At approximately 7:00 p.m. on October 24, 2011, Marco Cervantes and his girlfriend were having dinner in Bassett in the County of Los Angeles when he was

6

contacted by someone regarding the purchase of a car. Cervantes, who wished to buy a car, had posted an advertisement on Craig's List and, in response, had received a text and a call from a man who had identified himself as "Mike." When Cervantes spoke with Mike on the telephone, Mike told him he had two cars for sale, a 2005 Honda Accord and a 1992 Honda Civic. Cervantes, who was interested in purchasing the Civic, had several conversations with Mike during which they negotiated terms and the price. Mike sent to Cervantes pictures of both the Accord and the Civic over the phone and Cervantes offered him $900 for the Civic.

Mike and Cervantes arranged to meet that night. After he took his girlfriend home, Cervantes met with Mike and two other men at the Jack-In-The-Box restaurant on the corner of Don Julian and Workman Mill Road. The three men arrived at the restaurant in the Accord and the Civic. "Mike," who was actually Gildo, and Navarette were in the Accord and a third man, who was in a wheelchair and using special tools to help him drive, was in the Civic.

Cervantes spoke to Gildo and told him he did not have all of the money at that time, but really needed the car to get to school and work. Cervantes offered to pay Gildo $600 as a down payment and the remaining $300 within a month. He then told Gildo that he did not have the money with him as, at that point, he had been planning to just look at the car. However, when Gildo told Cervantes he would sell the Civic for a "good price," Cervantes decided to go to his home and get the $600.

Navarette drove Cervantes to his house in the Civic. Cervantes went inside, got the money from his room then went back to the car. Although it was Cervantes's understanding that they would be driving back to Jack-In-the-Box, Navarette parked the Civic in the lot at a post office approximately one block from the restaurant. Navarette had backed into the spot so the Civic was facing toward the lot's exit. The Accord was parked on the other side of the lot, next to a wall behind the post office. When Navarette parked the Civic on the other side of the parking lot, away from the Accord, Cervantes became suspicious and he asked Gildo to move the Accord closer to the Civic. Gildo did

7

so, then showed to Cervantes the pink slip to the Civic, but did not give it to him. Cervantes, however, got out of the Civic and gave to Gildo $600.

Even after Cervantes had given the money to Gildo, Navarette remained in the driver's seat of the Civic. Navarette then indicated the keys were "stuck in the ignition and would not come out." Cervantes offered to try to remove the keys but Navarette refused, stating Cervantes would probably break the key. Navarette then turned the car on and Cervantes, who was standing next to the open passenger side door, grabbed onto the car. However, Navarette drove off and as he did, Cervantes was thrown against the sidewalk.

The driver of the Accord then placed the car in reverse and began to back it up. Cervantes, however, noticed that the passenger side window was open so he "jumped through the window, took the keys from the ignition, . . . got back out [of the car through] the same window," then ran toward the post office. Gildo got out of the Accord and approached Cervantes with his fists up as if he were about to "hurt" Cervantes. Cervantes told Gildo, " 'Just give me my money back and I'll give you your keys.' " When Gildo hesitated, Cervantes told him that if he kept walking toward Cervantes, Cervantes would "call the cops." Gildo took the money from his pocket and tossed it onto the ground. When Cervantes then told Gildo to back up, he did so and, when Cervantes believed Gildo was a safe distance away, Cervantes grabbed his money and, as he started to run away, pulled from his pocket a cell phone and called 911.

In the meantime, Gildo had gone back to the Accord, pulled a wheelchair from the back of the car, opened the car door for the man who had been driving and, after the man had gotten into the wheelchair, Gildo and the man left the parking lot. At first Gildo assisted the man in the wheelchair. He then left the man and began to run down a nearby street called Pamela Kay Lane.

While Cervantes was still on the phone with police, he saw Navarette drive by in the Civic. Navarette was talking on the phone as he was driving and Cervantes saw him turn down the same street Gildo and the man in the wheelchair had headed down. When

police officers arrived at the post office parking lot between five and six minutes later, Cervantes gave to the officers the keys to the Accord.

Later, after receiving an admonition, Cervantes was shown a "photo six-pack." After viewing the photographs, Cervantes identified the man in the wheelchair and Navarette. Still later, Cervantes attended a live lineup. After being admonished, Cervantes viewed the lineup and again identified Navarette. In the "remarks section" of the identification form, Cervantes wrote: " 'Suspect No. 4 has very similar facial features that I can remember.' "

Los Angeles Deputy Sheriff Gordon Baker responded to Cervantes's call from the post office parking lot. When the deputy arrived, he found Cervantes to be "kind of frantic." Although Cervantes was cooperative, he was difficult to talk to because he was so upset. Cervantes did, however, give to Baker the telephone number of the individual he had been speaking with about purchasing the car. Cervantes did not tell the deputy he had hung onto the Civic's open door and had then been thrown to the ground. In his report, it was indicated Cervantes told Baker "that he had to move his foot away to avoid . . . being run over" by the Civic.

On October 24, 2011, Los Angeles Deputy Sheriff Ernesto Moran was contacted at the Industry Station by Beatris Cortez. Just before he spoke with Cortez, Moran had been notified that a robbery had occurred in the Bassett area. While he was investigating the robbery, Moran was told that the owner of the vehicle involved, a 2005 silver Honda Accord, was at the station. Cortez told Moran she had lent her Accord to a friend named Mike so that he could run some errands, that he had never returned the car and that she wished to report it stolen. The deputy, who knew the vehicle had been recovered from a parking lot near a Jack-In-the-Box restaurant, believed "something was wrong with [Cortez's] statement." She "appeared nervous" and the name "Mike" was the same name which had been given to deputies by the victim of the alleged theft. Based on information in her report, Moran determined Cortez had filed a false police report and he escorted her to an interview room to question her about it. During the interview, Cortez appeared "nervous, tr[ied] to play the denial" and became "upset." However, Cortez

9

eventually told the deputy there was no "Mike" and she had used that name because her boyfriend, Gildo, had told her to. Cortez indicated Gildo had "told her to report [the Accord] stolen because . . . the 'car had been involved in some shit.' " Gildo had told her he was a deputy sheriff and she gave his phone number to Moran.

Cortez told Moran that on October 24, 2011, Gildo had gotten home at approximately 3:00 p.m. He was looking at Craig's List on his computer when she asked him to go to the store with her. He, however, told Cortez he could not go to the store because he was going to "go with a friend to sell the Honda."

Los Angeles County Deputy Sheriff Alfredo Gomez, a detective assigned to the Industry Sheriff's Station, was the investigating officer assigned to the case involving Cervantes. During the investigation, Gomez had a number of meetings with Caddow in Banning. During one meeting, on October 26, 2011, Caddow gave to Gomez a key he had kept from the day of the incident with Gildo and Navarette. After booking the key into evidence, Gomez took it to the storage yard where the Honda Accord was being held. The key opened the door and started the ignition to the car.

During Gomez's interview with Cortez, she confirmed that the numbers used to call and text Caddow, Tamimi and Cervantes, belonged to Gildo. Gomez then informed Cortez, if she continued to assist with the investigation of Gildo, she would not be prosecuted for filing a false police report. After that interview, Cortez frequently contacted Gomez, informing him of Gildo's whereabouts and dealings. Cortez informed Gomez she knew several of Gildo's friends, including a handicapped man named Miguel Rincon who drove a maroon Jeep Cherokee. Cortez also told Gomez that Gildo owned a gun. In addition, during his investigation, Gomez verified Gildo was not a deputy sheriff.

On October 25, 2011, Cortez told Gomez that, on the 24th, Gildo had been on the Craig's List website and had "told [Cortez] that he [had] found a buyer for [a] friend's vehicle and that he would return later that evening." Gildo then told Cortez to "go report [the Honda Accord] stolen if she wanted it back."

10

On November 9, 2011, Deputy Sheriff Moran assisted in the execution of a search warrant at a house in an unincorporated area of La Puente. While sitting in front of the residence in his patrol car, Moran saw Gildo leave the house and get into a silver Honda. Moran, assisted by other deputies, took Gildo into custody.

d. *Prosecution evidence pertaining only to Navarette.*

After giving him his *Miranda*[5] rights, Detective Gomez interviewed Navarette on November 21, 2011. When he was asked how he knew Gildo and Rincon, Navarette stated they had met through mutual friends and had "hung out" on a couple of occasions at nightclubs or house parties. Navarette indicated that Gildo drove a silver car and Rincon drove a maroon Jeep Grand Cherokee. When asked if he had gone to the City of Banning, the Puente Hills Mall, East Los Angeles or the City of Commerce with Gildo and Rincon, Navarette indicated he had not gone to any of those locations. Navarette had, however, been with Gildo and Rincon " 'when that thing went down at Jack in the Box.' "

Navarette told Gomez he had known Gildo and Rincon for approximately one month. When Gomez reminded Navarette that the incident at the Jack-In-The-Box had occurred more than a month earlier, Navarette simply stated he was telling the truth. During the interview, Navarette was "slouched over in his chair" and when the detective asked him a question, he "look[ed] down, as if he [were] searching for an answer."

e. *Defense evidence offered by Navarette.*

Dr. Mitchell Eisen is a psychologist who is an expert with regard to memory. According to Eisen, a number of factors can contribute to an individual's ability to remember an event. Things such as "trauma," "weapon focus" or the presence of a weapon, the length of exposure to "to-be-remembered" material, "expectations," particularly when the stimuli is ambiguous, or any combination of these factors can all have an effect on one's ability to remember a person or event. In addition, cross-racial identifications may be more difficult than those of individuals of the same race.

---

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436.

According to Eisen, most people find it "a more challenging task to pick out faces or identify faces of other races compared to [those of] the same race." "Change blindness" is another factor which contributes to memory. As an example, Eisen explained, "You have somebody come up to a table . . . and they meet a guy who's 20-something, White . . . , average height, brown hair, button-up shirt. And they talk to him for a minute. And then he drops a piece of paper, bends down behind the counter, and a different guy [who resembles the first guy in appearance] stands up. [¶] And what these studies find is many people, most people, actually, don't notice the change. . . . They don't notice that the guy who stood up is actually a different guy."

With regard to identifications made from a "six-pack," Eisen stated most people "believe that the [guilty] guy must [be represented by one of the photographs]." That is why it is the best practice to admonish the individual viewing the six-pack that the actual culprit might not be depicted. Based on research and Department of Justice guidelines, "overriding principle[s] for composing a six-pack" include making certain that "no single photo or no single picture unduly stick[s] out from the group [and] that you have . . . an equivalent group of six." With regard to witness identification in general, Eisen was of the opinion that "[p]eople can and do make accurate identifications all the time. This is how the criminal justice system functions. But, . . . it's a fact . . . that sometimes people get it right and sometimes people get it wrong. [There are] both accurate and mistaken identifications . . . and the fact is it's a hard test. People are not very good at this. And making identifications is very difficult and fraught with error." Eisen continued, "The best indication, all other things being equal . . . is [a] report right after[] [an event]. It's fresher [and] more available."

2. *Procedural history.*

Following a preliminary hearing, on February 29, 2012, an information was filed in which Navarette was charged in count 1 with the violent (§ 667.5, subd. (c)) and serious (§ 1192.7, subd. (c)) felony of second degree robbery in violation of section 211, during which a principal was armed with a firearm (§ 12022, subd. (a)(1)). In count 2 of the information, Navarette was charged with the violent (§ 667.5, subd. (c)) and serious

12

(§ 1192.7, subd. (c)) felony of attempted second degree robbery in violation of sections 664 and 211. It was further alleged that, during the attempted robbery, Navarette personally used a firearm (§ 12022.53, subd. (b)) and that, if found guilty of the offense, any prison custody time imposed was to be served in state prison (§ 1170, subd. (h)(3)). Finally, in count 3 it was alleged Navarette committed the crime of petty theft (§ 484, subd. (a)), a misdemeanor.[6]

On June 12, 2012, Navarette entered pleas of not guilty to each of the charges and denied all of the special allegations. The matter was set for a "readiness hearing" and jury trial to be held on August 24, 2012. However, after the People's motion for a continuance was granted, the date for the jury trial was vacated and advanced. A jury trial was ultimately set for December 3, 2012.

Two juries were selected, one for Navarette and one for his codefendant, Gildo. It was stipulated that the jury panel for Navarette would be designated the "yellow jury." Pursuant to defense counsel's Evidence Code section 402 motion, proposed witness Beatris Cortez was sworn and testified. After her testimony, the People offered her " 'use immunity' " if she testified "honestly and truthfully." Cortez accepted the offer.

After the presentation of evidence, both Navarette's and Gildo's counsel requested that instructions for lesser included offenses be given with regard to count 1, the alleged robbery, and count 2, the alleged attempted robbery. The court heard argument on the issue, then denied the motion.

The trial court instructed both the juries simultaneously. After the court had completed its instructions, the prosecutor argued to both juries that Navarette and Gildo were guilty of the crimes charged. For argument by defense counsel, the trial court split the juries. The trial court instructed the yellow jury, which was trying Navarette, to report to the courtroom the following day at 10:00 a.m. and the jury which was trying Gildo to report to the courtroom at 1:30 p.m.

---

**6**    Navarette's codefendant, Gildo, was charged in the same information.

The following day, December 18, 2012, the prosecutor addressed Navarette's jury and argued the jury should consider that Navarette had admitted he knew both Gildo and Rincon. Navarette's counsel then addressed the jury and argued that if one were to look at the "entirety of the evidence," he or she would find there is a reasonable doubt Navarette "was involved in Mr. Caddow's robbery" or that he had a gun when he became involved with Mr. Tamimi. Counsel indicated that, at the end, he expected the jury to find Navarette "not guilty on those two charges." After the prosecutor then presented his rebuttal argument to Navarette's jury, the jurors began deliberating.

Before the prosecutor finished making his argument in rebuttal to Gildo's counsel's closing argument, the jury in Navarette's case indicated it had reached verdicts. With regard to count 1, the jury found "Navarette guilty of the crime of second degree robbery, on or about September 29, 2011, in violation of . . . section 211, a felony, [by] unlawfully and by means of force and fear tak[ing] personal property from . . . Craig Caddow . . . ." The jury further found that, in the commission of the above offense, the allegation "a principal in said offense was armed with a firearm . . . within the meaning of . . . section 12022[, subdivision] (a)(1) to be true." As to count 2, the jury found Navarette "guilty of the crime of attempted second degree robbery on or about October 20, 2011, in violation of . . . section[s] 664/211, a felony." The jury determined Navarette "did unlawfully and by means of force and fear take personal property from . . . Naser Eldin Tamimi . . . ."[7] The jury further found the allegation that, during the commission of the offense, Navarette "personally used a firearm, a handgun, within the meaning of . . . section 12022.53[, subdivision] (b) to be true." The jury then found "not true" the allegation that during the offense a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1). Finally, with regard to count 3, the jury

---

[7]     As the jury properly found Navarette guilty beyond a reasonable doubt of the offense of attempted second degree robbery in violation of sections 664 and 211, the fact that the jury form reads that Navarette did "take" personal property, rather than "attempt to take" personal property from Tamimi is not dispositive. It is undisputed that, as to count 2, Navarette was, for all intents and purposes, found guilty of attempted second degree robbery.

14

found Navarette "guilty of the crime of petty theft on or about October 21, 2011, in violation of . . . section 484[, subdivision] (a)," by unlawfully taking and carrying away the personal property of Marco Cervantes. When the jury was then polled, each juror indicated he or she was "in complete agreement with the verdicts and special findings made."

At sentencing proceedings held on January 14, 2013, counsel for Navarette asked the trial court to impose the "offer that the People had given . . . prior to trial . . . ." Counsel continued, "The offer previously had been one strike for 12 years. [Navarette] . . . had wanted to take the offer [and] [t]he People were willing to accept his plea. However, this was a packaged deal. That's why [Navarette] had to go to trial. When I asked the supervising D.A. whether he [would] separate [Navarette] out, the supervising D.A. refused to. So we were a ride-along with this case . . . ." Navarette's counsel then emphasized that Navarette had a "minor record" which consisted of only two misdemeanors and, with regard to the present matter, he apparently "just fell in with the wrong people." The prosecutor agreed that Navarette had wanted to take the deal offered. Accordingly, the district attorney recommended that, although Navarette would be getting two strikes from this matter, he should be sentenced to the previously offered term of 12 years. The sentence would consist of the midterm with regard to count 2, the attempted robbery, plus 10 years for the gun use allegation. The sentences for count 1, the robbery, and count 3, the petty theft, would then be run concurrent to the term imposed for count 2.

The trial court agreed to impose the 12-year term and sentenced Navarette as follows: "It is the judgment of this court, as to count 2, that probation be denied. Defendant will be sentenced to the state prison for the [midterm] of two years. In addition and consecutive thereto, a ten-year term is imposed by virtue of the [gun] use allegation finding." With regard to count 1, the trial court sentenced Navarette to a concurrent midterm of three years in state prison and a concurrent term of one year for the finding a principal was armed with a firearm. For count 3, the trial court imposed six months in county jail, the time to be served "concurrent to all other time in this matter."

15

The trial court awarded Navarette presentence custody credit for 421 days actually served and 63 days of good time/work time, or a total of 484 days. The court then imposed a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment with regard to each count (Gov. Code, § 70373), a $280 restitution fine (§ 1202.4, subd. (b)), a $10 crime prevention fund fine with regard to each count (§ 1202.5) and a stayed $280 parole revocation restitution fine (§ 1202.45). With regard to restitution to Caddow, at a hearing held on February 15, 2013, it was determined Navarette and Gildo were jointly and severally liable for $6,168.60, plus interest at a rate of 10 percent from the date of sentencing.

Navarette filed a timely notice of appeal on February 15, 2013.

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct a independent review of the record. By notice filed November 20, 2013, the clerk of this court advised Navarette to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

17